**COSMOPOLITAN CREDIT AND INVESTMENT CORPORATION, Plaintiff,**

v.

**BLYTH EASTMAN DILLON AND CO., INC., Defendant.**

**No. 79–3211–Civ–EPS.**

United States District Court, S. D. Florida, Miami Division.

Feb. 23, 1981.

Timothy J. Norris, of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff.

Dwight Sullivan, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

SPELLMAN, District Judge.

THIS IS an action for damages arising from the transfer of two Government National Mortgage Association certificates [hereinafter "GNMA's"]. Plaintiff, Cosmopolitan Credit and Investment Corporation [hereinafter "Cosmopolitan"], has asserted that the Defendant, Blyth Eastman Dillon and Co., Inc. [hereinafter "BEDCO"], converted the two GNMA certificates through its transactions with Legel, Braswell Government Securities Corporation [hereinafter "Legel"], in violation of Rule 10b–5 of the Securities Exchange Act of 1934 as well as the common law. This cause is now before the Court on the parties' cross-motions for summary judgment on the issue of liability.

The relevant facts in issue (as stipulated by the parties in their Pretrial Stipulation dated March 13, 1980) are:

1) whether or not BEDCO converted the two certificates;

2) whether or not BEDCO was a bona fide purchaser of the certificates;

3) whether or not Cosmopolitan has standing to assert a 10b–5 claim against BEDCO; and

4) whether or not BEDCO's activities herein violated Rule 10b–5.

The parties agree that Article 8 of the Uniform Commercial Code governs GNMA transactions and is therefore applicable to the conversion claim. In addition, the parties have stipulated that the Court must determine whether Article 9 applies here.

## I. BACKGROUND

A GNMA is a security issued in the form of a certificate by the Government National Mortgage Association. It is backed by a

group of FHA and VA mortgages and carries an interest rate calculated according to the interest rates of its underlying mortgages. Each GNMA carries a designated pool number which refers to the group of government-guaranteed mortgages upon which it is based. These securities are regularly traded in financial markets at a premium or at a discount, depending upon the current prevailing interest rate. They call for monthly principal and interest payments to be made to the registered owner; and are therefore constantly declining in value as the constituent mortgages are paid off.

The owner of a GNMA may either hold on to it, sell it or borrow against it using it as collateral. In the latter case, the transaction is called a repurchase agreement, whereby the owner "sells" the GNMA to a second party who, at the same time, agrees to sell it back to the owner at an agreed future date for a price which includes interest accrued to the second party between the times of sale and resale (or buy-back).[1]

When performance becomes due under the repurchase agreement, the GNMA may either be redeemed through payment of the agreed resale price, sold outright or "rolled over" by entering into a superseding repurchase agreement.

While industry rules require repurchase agreements to take the form of sales rather than conventional secured loans, a GNMA sold pursuant to such an agreement is not reregistered to the second party but remains in the name of the original owner, who also continues to receive the monthly principal and interest payments.

These operations transpire in much the same manner as in other securities markets—business is done by telephone and confirmed in writing afterward. The physical certificates are handled on a completely impersonal basis and are rarely seen by the individuals who negotiate the deals.

A GNMA certificate standing alone is non-transferrable; it only becomes negotiable when a properly executed Form 1832 is attached.[2]

## II. FACTS

In November of 1978, Plaintiff issued a GNMA backed by pool # 23271 which had a face value of $1,056,658.36 and was represented by two certificates—one for $500,000.00 and the other for $556,658.36. Although Cosmopolitan's name appeared on each certificate as both the issuer and the registered owner, it never took physical possession of the documents; they were retained instead by its transfer agent, the Chemical Bank in New York, pending further instructions from Cosmopolitan.

On November 10, 1978, Plaintiff's President completed a Form 1832 in blank for each certificate. Thereafter, on November 20, 1978, Cosmopolitan entered into a repurchase agreement with Legel whereby it sold the two GNMA certificates backed by pool # 23271 to Legel for $1,010,000.00 and contemporaneously agreed to buy them back on December 27, 1978 for $1,020,352.50. To effect the transfer, Cosmopolitan forwarded the two 1832's described above to Legel's New York agent, Irving Trust Company. Irving then took the 1832's to Chemical Bank, paid $1,010,000.00 for the account of Cosmopolitan and received the two certificates in exchange. While the negotiations between Plaintiff and Legel occurred over the telephone, Legel subsequently ratified them by two written confirmation forms.

---

1. The transaction may also take the converse form, called a reverse repurchase agreement, whereby the first party buys the GNMA from the second party, at which time it also agrees to buy back, or repurchase, from the first party on the agreed date.

2. A Form 1832 is issued by the Treasury Department and provides in pertinent part:

   For value received I assign to _____ the following-described registered securities of which I am (we are) the owner(s) or the duly authorized representative(s) of the owner(s):

   \* \* \* \* \* \*

   and hereby authorize discharge of registration thereof on the books of the Treasury Department.
   Said forms are often executed in blank, signifying to the holder of the certificates that it should relinquish them to the individual who presents the corresponding Form 1832.

On December 27, 1978, the redemption date, Cosmopolitan decided to roll over the transaction. It entered into a new repurchase agreement with Legel whereby it again sold the two certificates to Legel and agreed to buy them back on January 30, 1979 for $974,660.72. As consideration for the roll-over Cosmopolitan paid Legel $55,-352.50[3] and retained $965,000.00 of the original $1,010,000.00. During this entire period the certificates were held by Legel's agent, Irving Trust Company, and Cosmopolitan's name remained thereon as the registered owner.

On that same day, December 27, 1978, Legel entered into another repurchase agreement with the Defendant, BEDCO, for those same two GNMA certificates, whereby Legel sold them to BEDCO for $981,000.00 and agreed to redeem them on January 30, 1979 (the redemption date of its agreement with Cosmopolitan) for $990,-728.25. To complete the transaction (which was negotiated over the telephone and later ratified by written confirmations from BEDCO to Legel), BEDCO's agent paid $981,000.00 to Legel's account and obtained the two certificates with attached 1832's from Irving Trust.

On January 4, 1979, BEDCO became aware that Legel was experiencing serious financial difficulties. On January 8, 1979, BEDCO tendered the certificates for redemption and Irving Trust refused to comply. After sending written notification to Legel of its intent to dispose of the securities if no payment was forthcoming as of 2:00 o'clock P.M. on January 10, 1979, with no response, BEDCO sold the GNMA backed by pool # 23271 to Merrill Lynch for $995,899.22. Cosmopolitan never attempted to redeem the certificates from Legel. On June 6, 1979, Legel was adjudicated bankrupt.

Cosmopolitan then brought this action against BEDCO, alleging:

1) In willful disregard to Cosmopolitan's rights, BEDCO converted the two certificates to its own use and sold them to Merrill Lynch. But for said sale, Cosmopolitan asserts, it would be entitled to reclaim the GNMA from BEDCO. Therefore, Plaintiff believes it should rightfully recover the money BEDCO received from Merrill Lynch.[4]

2) Cosmopolitan was defrauded by Legel's intentional failure to disclose to it that:

a) Legel would re-pledge the GNMA on terms that would impair Cosmopolitan's right to redeem them, thereby causing Plaintiff to lose its equity in the securities;

b) Legel did so transfer the GNMA to BEDCO; and

c) Legel was insolvent.

Cosmopolitan maintains it would not have dealt with Legel had those facts been disclosed. Plaintiff claims that Legel would not have been in a position to carry out this fraudulent transaction but for the financial backing provided to it by BEDCO through the repurchase agreement. Thus, BEDCO's actions operated as a fraud upon Cosmopolitan and constituted aiding and abetting Legel in violation of Rule 10b-5.

As a defense to the first contention, BEDCO asserts that it was a bona fide purchaser and acquired the GNMA certificates free of all adverse claims. In response to the second ground, BEDCO claims that, even if the Plaintiff could prove a primary violation of Rule 10b-5 by Legel, Plaintiff has failed to demonstrate the requisite intent on the part of BEDCO so as to render it liable as an aider and abettor under the statute. It is also BEDCO's position that its alleged complicity in Legel's

---

**3.** The $55,352.50 figure represented $10,352.50 (the difference between the original purchase price of $1,010,000.00 and the corresponding redemption value of $1,020,352.50) plus $45,-000.00 (the $1,010,000.00 original purchase price less the $965,000.00 roll-over purchase price).

**4.** The Court notes that Cosmopolitan did retain the $965,000.00 from its roll-over agreement with Legel.

operation was not tantamount to the substantial assistance required to establish aider and abettor liability.

## III. CONVERSION CLAIM

The parties have stipulated to the applicability of Uniform Commercial Code Article 8. In construing the UCC, definitions are important. The following is a list of those pertinent to the issue at bar:

1) A bona fide purchaser is defined as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form [5] or of one in registered form issued to him or indorsed to him in blank." Fla. Stat. § 678.8–302.

2) "Purchaser" means a person who takes by purchase. Fla.Stat. § 671.1–201(33).

3) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property. Fla.Stat. § 671.1–201(32).

4) "Value" is given in return for any consideration sufficient to support a simple contract. Fla.Stat. § 671.1–201(44)(d).

5) "Good faith" means honesty in fact in the conduct or transaction concerned. Fla.Stat. § 671.1–201(19).

6) "Delivery" with respect to instruments, documents of title, chattel paper or securities means voluntary transfer of possession. Fla.Stat. § 671.1–201(14).

7) A person has "notice" of a fact when
a) he has actual knowledge of it; or
b) he has received a notice or notification of it; or
c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. Fla.Stat. § 671.1–201(25).

8) According to Fla.Stat. § 678.8–301(2), "[a] bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim."

9) Fla.Stat. § 678.8–301(1) defines adverse claim as ". . . a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security."

Cosmopolitan maintains it is the adverse claimant of a right to redeem the GNMA certificates on January 30, 1979 at the agreed price. Therefore, the central issue here is whether BEDCO was a bona fide purchaser. The Plaintiff contends that BEDCO does not meet the criteria for a bona fide purchaser on the grounds that it knew or should have had notice of Cosmopolitan's adverse claim because:

1) the documents (confirmation slips, GNMA certificates and 1832 Forms) reflected Cosmopolitan as the registered owner; and Cosmopolitan continued to receive the monthly principal and interest pass-through payments; and

2) BEDCO knew Legel was a small operation which had insufficient assets to have owned these securities and that Legel's primary business function was the financing of transactions for its clients.

According to Cosmopolitan, all of the above facts known to BEDCO should have caused it to inquire as to the ownership of the certificates.

BEDCO's counter-arguments are:

1) the documents it received from Legel would have been in the same form whether Cosmopolitan had sold the certificates to Legel outright or Legel was merely holding them pursuant to a repurchase agreement. That agreement is buttressed by the testimony of Plaintiff's President [deposition of Elizabeth Erholm-Chester at pp. 78, lines 11–15 and 80, lines 1–7]. The Defendant further states that the documents only indicated the identity of the registered owner at the time the certificates were put into negotiable form. Since these securities change hands recurrently, the fact that Legel was not designated as the regis-

---

**5.** "A security is in 'bearer form' when it runs to bearer according to its terms and not by reason of any indorsement." Fla.Stat. § 678.8–102(1)(d).

tered owner would not provide BEDCO with cause for suspicion.[6]

2) BEDCO did investigate Legel's background at the onset of their commercial relationship. The Defendant believed Legel maintained a sound, reliable operation; it had always fulfilled the terms of its obligations during the "couple of years" they dealt with each other prior to this agreement and BEDCO did not deem it necessary to check up on Legel each time they did business [deposition of Tim Ellington at pp. 71, lines 11–22 and 73, lines 1–9].[7]

Cosmopolitan sets forth an additional argument based on the Securities Exchange Commission's hypothecation rules, 17 C.F.R. §§ 240.8c–1 and 240.15c2–1 which basically provide that securities carried for the account of a customer are not to be subjected to any lien for a sum which exceeds the indebtedness of the customer on the securities. § 240.8c–1(f) says:

> No person subject to this section shall hypothecate any security carried for the account of a customer unless at or prior to the time of each such hypothecation, he gives written notice to the pledgee that the security pledged is carried for the account of a customer and that such hypothecation does not contravene any provision of this section.

Plaintiff argues that if the certificates were not owned by Legel it was required to comply with said rules by giving BEDCO notice of the extent of Cosmopolitan's interest in the GNMA's. Plaintiff further asserts that BEDCO is presumed to have knowledge of those regulations; it received no such notification from Legel and it was therefore put on notice of a possible conflict and cannot be considered to have acted in good faith. Both parties have filed extensive briefs regarding the applicability of the hypothecation rules to this case. Without reaching that issue, the Court finds that BEDCO had a right to travel under the assumption that Legel was acting in full compliance with the law. Additionally, if BEDCO believed the certificates were owned by Legel, it would not have even considered the existence of a situation outlined in the hypothecation rules and would have had no reason to be alerted by the absence of such certification.

Having rejected that argument, the Court now turns to the question of whether BEDCO should have been put on notice by the contents of the documents representing these transactions. Fla.Stat. § 678.8–304 provides in pertinent part:

> (1) A purchaser ... of a security is charged with notice of adverse claims if:
>
> \*      \*      \*      \*      \*      \*
>
> (b) The security is in bearer form and has on it an unambiguous statement that it is the property of a person other than the transferor. The mere writing of a name on a security is not such a statement.
>
> (2) The fact that the purchaser (including a broker for the seller or buyer) has notice that the security is held for a third person or is registered in the name of or indorsed by a fiduciary does not create a

---

**6.** That argument is emphasized by the fact that the transaction between Cosmopolitan and Legel took place on the same day as the Legel-BEDCO deal. If the former had actually been an outright sale, it is likely that the registration would not yet have been amended. As for the monthly remittances, the Court finds that BEDCO, having merely entered into a repurchase agreement, would not have received the payments regardless of whether Cosmopolitan or Legel was the owner. BEDCO would have no reason to be concerned with that aspect of the securities and could naturally assume that the one entitled to the proceeds would take steps to protect its own interests.

**7.** BEDCO therefore had no reason to believe the transaction would not have followed its usual course, i. e., that Legel would redeem the certificates from BEDCO on January 30th as per the Legel-BEDCO repurchase agreement and then complete its repurchase agreement with Cosmopolitan whereby Cosmopolitan would redeem the certificates on that same day, January 30th, as per the Cosmopolitan-Legel agreement.

The Court notes that Cosmopolitan did not investigate Legel when they transacted, but instead assumed Legel would act reputably [deposition of Erholm-Chester at p. 103, line 16 to p. 104, line 24].

duty of inquiry into the rightfulness of the transfer or constitute notice of adverse claims. If, however, the purchaser ... has knowledge that the proceeds are being used or that the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims.

Comment 3 thereto says, "mere notice of the existence of the fiduciary relation is not enough in itself to prevent bona fide purchase, and the purchaser is free to take the security on the assumption that the fiduciary is acting properly." "Securities dealt in on financial markets are generally assumed to be free of adverse claims. (Section 8–301). That assumption should not be lightly negated. Therefore a strict rule as to notice of a restriction on transfer is here imposed." That standard is: "Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it." Fla.Stat. § 678.8–204 and Comment 1 thereto.

Sufficiency of notice of an adverse claim was addressed by the Court in another case involving GNMA certificates. *In re Legel, Braswell Government Securities Corp.: Plano Savings & Loan Ass'n v. Irving Trust Co.*, 28 U.C.C.Rep. 785 (S.D.Fla.1980). There, Plano entered into an option agreement to purchase GNMA securities from Legel. To secure its obligations, Plano pledged a GNMA certificate to Legel. Pursuant to Legel's request, Plano instructed its agent, Republic National Bank, to deliver the certificate to Legel's agent, Irving Trust. Attached was a transmittal letter reflecting the GNMA's certificate and pool numbers, registration in the name of Plano and instructions that it was: "Sent to [Irving] for the a/c Legal Braswall [sic] Government Securities Corp. a/c 08–116–727 to be used as Collateral to be held on deposit for Plano Savings & Loan Association."

The certificate contained no endorsement; nor was it accompanied by a Form 1832. After Irving received the GNMA, Legel contacted Plano to request that a Form 1832 executed for Legel be sent to Irving Trust. Plano's officer complied but first deleted the words "and hereby authorize(s) discharge of registration thereof on the books of the Treasury Department." Plano's GNMA was subsequently surrendered to the transfer agent, Chemical Bank, whereupon it was cancelled and a new GNMA certificate was issued in Legel's name.

At the time, Legel had a general collateral agreement with Irving whereby the latter was granted a security interest in all Legel securities which came within its possession. Upon order of the Bankruptcy Judge, Irving liquidated the GNMA and held the proceeds pending further instruction by the Court.

The Court found that Plano had not authorized Legel to repledge the GNMA; it was never aware of the reregistration; and it had neither understood nor intended that the 1832 would authorize reregistration, but was told instead by Legel that it was a mere formality. The sole issue became whether, under those facts, Irving was a bona fide purchaser of the GNMA, i. e., whether Irving had notice of Plano's ownership and acted in good faith.

The Court held that, if Irving did not have actual notice of Plano's claim, it certainly had constructive knowledge or reason to know by virtue of the unambiguous transmittal letter and the expurgated Form 1832. Those factors, said the Court, "amounted to circumstances such that Irving Trust's suspicions should have been aroused." *Id.* at 789. After further holding that Irving had acted in bad faith by failing to inquire, the Court required Irving to pay the liquidated proceeds to Plano. The holding was based in part on New York's version of U.C.C. § 8–304.[8] Florida's parallel statute requires "an unambiguous

---

8. § 8–304(3), New York Consolidated Laws, Uniform Commercial Code, which is not included in the Official Text, requires knowledge of such facts that the purchaser's conduct amounts to bad faith.

statement that it is the property of a person other than the transferor." Fla.Stat. § 678.8–304.[9]

■ Comparing the facts in *Plano* to those at bar, and applying the relevant provisions of Article 8, it is the Court's opinion that BEDCO was a bona fide purchaser of the two GNMA certificates. Cosmopolitan took no precautions as did Plano to protect its ownership. Considering the nature of the market, the Court is of the opinion that the statement of Cosmopolitan's ownership contained in the documents was not sufficiently "unambiguous" or "conspicuous" to fall within the scope of the statutes, particularly in light of the uncontroverted testimony that the 1832 forms would have been identically executed whether Legel owned the GNMA's outright or was merely holding them subject to a repurchase agreement. The Court finds that Cosmopolitan placed the certificates into the stream of commerce free of restriction by surrendering them to Legel in fully negotiable form. BEDCO therefore had no actual notice of Cosmopolitan's interest in this arm's-length transaction and the Court finds nothing in the record to indicate that it should have had cause to know. Fla.Stat. § 678.8–315 provides:

> (1) Any person against whom the transfer of a security is wrongful for any reason, including his incapacity, may against anyone *except a bona fide purchaser* reclaim possession of the security or obtain possession of any new security evidencing all or part of the same rights or have damages.

(emphasis added). The Court having found no genuine issue of material fact as to BEDCO's status as a bona fide purchaser, and in view of the foregoing, it is

ORDERED AND ADJUDGED that summary judgment be and the same is hereby GRANTED in favor of the Defendant on Plaintiff's claim for conversion.

## IV. APPLICABILITY OF ARTICLE 9

■ Having found BEDCO to have been a bona fide purchaser, the Court further concludes that Article 9 would not apply according to Fla.Stat. § 679.9–309:

> Nothing in this chapter limits the rights of a holder in due course of a negotiable instrument (§ 673.3–302) or a holder to whom a negotiable document of title has been duly negotiated (§ 677.7–501) *or a bona fide purchaser of a security (§ 678.-8–301)* and such holders or purchasers take priority over an earlier security interest even though perfected.

(emphasis added).

## V. 10b–5 CLAIM

Plaintiff asserts that Legel engaged in a course of business which operated as a fraud upon Cosmopolitan and that BEDCO aided and abetted in the perpetration of said deception.

BEDCO raises three main defenses:

1) Cosmopolitan was not a buyer or seller of securities and therefore has no standing to bring a 10b–5 action.

2) BEDCO cannot be liable as an aider or abettor unless Cosmopolitan first shows a primary violation of 10b–5 by Legel.

3) Even if Legel did commit a fraud upon Cosmopolitan, Plaintiff must establish a clear showing of BEDCO's intent to aid and abet in that violation.

The Fifth Circuit has adopted a three-pronged test for determining liability for aiding or abetting in a 10b–5 violation:

1) Another party must have violated the securities laws;

2) The alleged aider-abettor must be generally aware of his role in improper activity; and

3) He must knowingly render substantial assistance.

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975).

According to paragraph 22 of the Complaint, "[w]ithout the financing provided to Legel, Braswell by BEDCO and other similar institutions in the manner indicated herein, Legel, Braswell would not have been able to carry on a course of business

---

**9.** *See* text at p. 959, *supra.*

which acted as a fraud upon its customers, including Cosmopolitan." The Fifth Circuit noted in *Woodward* that:

> If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant, such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall within that category and would expose the bank to liability for aiding and abetting. Imposition of such liability upon banks would virtually make them insurers regarding the conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases.

*Id.* at 96, citing Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution*, 120 U.Pa.L. Rev. 597, 630–31 (1972).

■ The Court having previously determined that BEDCO was a bona fide purchaser without knowledge of any impropriety, it is obvious that the requisite element of scienter cannot be found here. In addition, the Court would conclude that the activities of BEDCO alleged to have constituted aiding and abetting did not amount to "substantial assistance." [10] Based on the foregoing, it is

ORDERED AND ADJUDGED that summary judgment be and the same is hereby GRANTED in favor of the Defendant on Plaintiff's 10b–5 claim.

10. Therefore, the other issues raised by BEDCO need not be addressed.