FIRST NATIONAL BANK OF LAS
VEGAS, NEW MEXICO,
Plaintiff-Appellant,

v.

ESTATE OF Milton B. RUSSELL, Peter
B. Edwards, Charles L. Shirley, Jr., Gary
M. Mattson, Steven F. Caldwell, Bossier
Bank & Trust Company, Dale A. Ander-
son, Pinemont State Bank, Herman K.
Beebe and Jean A. Quartermont, De-
fendants-Appellees.

No. 80–1401.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 23, 1981.

Hirsch, Westheimer, Block & Wilk, Gaye Rothman, Michael S. Wilk, Houston, Tex., for plaintiff-appellant.

Rosalind C. Cohen, Asst. Gen. Counsel, Jacob H. Stillman, Frederick B. Wade, Ralph C. Ferrara, Robert Lipsher, S.E.C., Washington, D. C., amicus curiae.

Delange & Hudspeth, Michael R. Tibbets, Houston, Tex., for Milton Russell.

Michael A. Lamson, Houston, Tex., for Shirley.

Foreman & Dyess, Darrel E. Reed, Jr., Houston, Tex., for Bossier Bank and Anderson.

Before COLEMAN, GARZA and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

Plaintiff First National Bank of Las Vegas, New Mexico, appeals from the district court summary judgment in favor of defendants in this securities fraud case. The district court granted summary judgment for defendants, finding that the notes involved in the transaction at issue were not

securities and that the transaction was not a purchase and sale of a security. We vacate and remand.

"In considering the propriety of summary judgment, plaintiff's factual version must be taken as true." *Shores v. Sklar*, 647 F.2d 462, 464 (5th Cir. 1981) (en banc). As the *Shores* Court further noted, "Reciting the facts most favorably to the plaintiff, as we do below, does not imply that he can prove his allegations." *Id.* With that in mind, the facts indicate that the following transactions occurred.

Russell, Kennedy & Hodgden, Inc., was incorporated in 1973 and began doing business as a broker-dealer in United States government and municipal securities.[1] The firm apparently was unprofitable from the start. According to the plaintiff, to generate funds to cover losses suffered by the brokerage firm and by its president, and to provide the firm with working capital, the brokerage firm initiated a plan involving a series of repurchase transactions. A repurchase transaction is a sale of securities coupled with a concurrent agreement by the seller to repurchase securities of the same description on a date subsequent to the initial transaction.[2] Russell, Kennedy &

Hodgden offered to sell United States Treasury Notes to its customers, and to repurchase the securities at par plus a greater rate of interest than that payable on the Treasury Notes. The customers of the repurchase transactions were small banks and other financial institutions that had previously purchased and sold securities through Russell, Kennedy & Hodgden.

The plan was to operate basically as follows. The customers were instructed to wire their money to Bossier Bank & Trust Company, a Louisiana bank.[3] They were told to expect a safekeeping receipt in the mail.[4] Following their acceptance of the sale and repurchase offers, the customers would receive two confirmations, one confirming the sale of the securities and one confirming the repurchase of the securities.

Between January 20, 1976 and May 26, 1977, Russell, Kennedy & Hodgden entered into at least twenty-seven agreements to sell and repurchase United States Treasury Notes. The brokerage firm, however, did not own and never acquired the securities in question, and did not deliver them to the purchasing institutions. Obligations to repurchase were extended by rolling over[5]

---

1. From September 1973 to November 1975, the brokerage firm was registered with the Texas Securities Board. After the Securities Acts Amendments of 1975, Pub.L.No. 94–29 (June 4, 1975), which placed broker-dealers in municipal securities under the oversight of the Securities and Exchange Commission through the Municipal Securities Rulemaking Board, 15 U.S.C.A. § 78o–4, the brokerage firm withdrew its registration with the Texas Securities Board and ceased its activities in municipal securities.

2. For an in-depth explanation of the nature of the repurchase transaction generally, *see SEC v. Miller*, 495 F.Supp. 465 (S.D.N.Y.1980). The *Miller* court concluded that "[f]rom a purely economic perspective . . . , a repo [repurchase agreement] is essentially a short-term collateralized loan, and the parties to these transactions tend to perceive them as such." *Id.* at 467 (footnote omitted). We note, however, that whether that court considered the transaction to be an actual sale or a collateralized loan, § 10(b) of the 1934 Act was applicable since the Second Circuit holds that a pledge of securities constitutes a sale for purposes of the 1934 Act. Thus, the jurisdictional question present in this case was not raised in *Miller*. *See United States v. Gentile*, 530 F.2d 461, 466–67 (2d

Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976). In this Circuit, on the other hand, in a transaction that is considered to involve only a collateralized loan, it is unlikely that there would be a "purchase or sale" of a security as required by § 10(b). *See McClure v. First Nat'l Bank of Lubbock*, 497 F.2d 490, 495 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

3. Bossier Bank accepted Russell, Kennedy & Hodgden as a clearing customer, apparently as a result of the friendship between Dale Anderson, vice president of Bossier Bank, and Milton Russell of Russell, Kennedy & Hodgden.

4. In dealing with securities, safekeeping receipts are used in lieu of actual delivery to transfer custody, title, and control of the securities to the purchaser through a bookkeeping entry at the clearing bank.

5. The term "rolling over" refers to "entering into a superseding repurchase agreement." *Cosmopolitan Credit & Inv. Corp. v. Blyth Eastman Dillon & Co.*, 507 F.Supp. 954, 956 (S.D. Fla.1981).

the transactions or were settled with funds obtained from the next purchaser. By paying a repurchase transaction with an insufficiently funded check, the brokerage firm gained additional time to find a purchaser to wire funds to Bossier Bank in an amount sufficient to pay the check.

In May 1977, First National Bank of Las Vegas, which had previously purchased securities through Russell, Kennedy & Hodgden, was solicited by representatives of the brokerage firm to enter into a repurchase transaction. In connection with this transaction, the brokerage firm agreed, either for itself or as an agent for Bossier Bank, to sell Treasury Notes to First National Bank in the aggregate principal amount of $600,000. The brokerage firm also agreed to repurchase the Notes, with settlement of the repurchase deferred for thirty days, for the sale price plus interest at 6½ percent, or a sum of $603,141.67. Ivan Hilton, president of First National Bank, understood that he would receive a safekeeping receipt evidencing First National Bank's ownership, custody, and control of the Treasury Notes.

The record indicates that the transaction was treated by First National Bank in all relevant respects as a purchase and sale of securities. There was no commercial banking relationship between First National Bank and Russell, Kennedy & Hodgden; rather, First National Bank was a customer of the brokerage firm. Hilton testified in his deposition that he considered the transaction as an investment and not as a loan. First National Bank did not investigate the credit of the brokerage firm, request documentation with respect to the firm's financial condition, or take any other action customary in the banking business before making a loan. No promissory note evidencing a loan existed and the parties did not enter into a pledge agreement. Rather, on May 26, 1977, First National Bank transferred $600,000 by wire to Bossier Bank for the

account of Russell, Kennedy & Hodgden in payment of the purchase price of the securities.[6] In turn, the brokerage firm sent to First National Bank two confirmation slips, one confirming the sale of the Treasury Notes to First National Bank and the other confirming the repurchase of the Notes by the brokerage firm with settlement thirty days thereafter. The confirmations did not expressly restrict First National Bank's right to sell or otherwise dispose of the Notes and to fulfill its obligation to the brokerage firm by delivering securities of a like kind at the specified date.

Russell, Kennedy & Hodgden's repurchase arrangement with First National Bank was its last. Pinemont Bank, a previous purchaser of securities from Russell, Kennedy & Hodgden in a repurchase transaction, threatened to hold Bossier Bank accountable for recommending as a safe investment the $600,000 repurchase transaction that Pinemont entered into with the brokerage firm. In response to Pinemont's threats, Bossier Bank closed the brokerage firm's clearing account on May 23, 1977. On May 26, 1977, when First National Bank wired its $600,000 to Bossier Bank to purchase the securities, Bossier Bank immediately wired the money to Pinemont. Russell, Kennedy & Hodgden never delivered the Treasury Notes to First National Bank or paid First National Bank the repurchase price for the Treasury Notes. On September 19, 1977, Russell, Kennedy & Hodgden was adjudicated a bankrupt as a result of involuntary bankruptcy proceedings instituted in July 1977.

First National Bank commenced this securities fraud action on October 5, 1977, alleging violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S. C.A. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.[7] Named as defendants were various individuals alleged to have been officers, employees, and controlling persons of

---

6. The wire transfer was not restricted "versus delivery" so as to prevent Russell, Kennedy & Hodgden from obtaining the funds before delivering the Treasury Notes.

7. In addition, First National Bank's complaint alleged violations of Texas state statutes and common law fraud. (References to the complaint are to the fourth amended complaint.)

Russell, Kennedy & Hodgden,[8] Bossier Bank, three individuals associated with Bossier Bank,[9] and the Pinemont Bank of Houston, Texas. First National Bank sought to recover for the losses it sustained as a result of the repurchase transaction it entered into with Russell, Kennedy & Hodgden.[10]

On December 6, 1978, First National Bank filed a motion for partial summary judgment as to the purchase and sale of securities and use of mails and instrumentalities of interstate commerce. On September 24, 1979, Bossier Bank filed a motion for summary judgment, claiming that the repurchase transaction in question did not involve either a purchase or sale of securities within the meaning of the 1934

Act. On November 19, 1979, the district court denied plaintiff's motion for partial summary judgment and granted defendants' motion for summary judgment. In addition, the court dismissed plaintiff's accompanying state claims. On the same date, the district court entered a final judgment dismissing the case against all defendants. In its memorandum opinion, the district court concluded that (1) "the notes were not securities within the meaning of the Federal Securities Act" and (2) "the transaction does not rise to the dignity of a purchase and sale of a security for Section 10(b) purposes." Record, vol. 8, at 1784, 1787.

■ Section 10(b) of the Securities Exchange Act of 1934[11] and Rule 10b–5[12]

---

**8.** The individuals associated with Russell, Kennedy & Hodgden that were named as defendants are Charles L. Shirley, Jr., Peter B. Edwards, Steven F. Caldwell, and Gary M. Mattson. Milton B. Russell died on January 26, 1978, and his Estate was substituted for him as a defendant in this action. According to the plaintiff's complaint, during 1976 and 1977, Milton Russell served in various capacities with Russell, Kennedy & Hodgden, including positions as director, president, and chairman of the executive committee of that firm. Also during that time, Charles Shirley served as a sales manager, vice president, and vice chairman of the executive committee; Peter Edwards was a securities salesman; Steven Caldwell served as an assistant vice president and manager of the executive committee, and Gary Mattson served as an officer, vice chairman, and member of the executive committee. These defendants will be collectively referred to by reference to the brokerage firm of Russell, Kennedy & Hodgden.

**9.** The individuals associated with Bossier Bank are Herman K. Beebe, Jean A. Quartermont, and Dale A. Anderson. According to the complaint, at all relevant times, Herman Beebe was a major stockholder, chairman of the board of directors, and a member of the executive committee of Bossier Bank. Jean Quartermont was the president of Bossier Bank and a member of the executive committee, and Dale Anderson was a senior vice president of Bossier Bank. Reference to Bossier Bank will include reference to these individuals.

**10.** First National Bank's action was consolidated with another lawsuit brought by the Mutual Federal Savings and Loan Association of Atlanta, Georgia. Mutual Federal's action also alleged violations of the federal securities laws and state law based on the purchase and sale of

Treasury Notes. Although the district court's grant of summary judgment related to both cases, Mutual Federal did not appeal from the judgment entered against it. Consequently, Mutual Federal is not a party before this Court.

**11.** Section 10(b) provides:

Sec. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j(b).

**12.** Rule 10b–5 states:

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would

thereunder prohibit fraud in connection with the "purchase or sale" of "any security." The term "security" is broadly defined in section 3(a)(10) of the 1934 Act to encompass a wide variety of instruments including notes, bonds, and debentures.[13] The district court stated that "[n]otes which are reflective of individual commercial transactions are generally outside the purview of the Act." Record, vol. 8, at 1783. The district court noted that the following factors have led the Fifth Circuit to conclude that a note was not a security: " 'The note was payable in fixed amounts at fixed times, repayment not being conditioned upon profit or productivity of the company. No class of investors was involved, only the lending bank. The bank anticipated no gain beyond repayment of the note with interest.' " Id. at 1784 (quoting National Bank of Commerce v. All American Assurance Co., 583 F.2d 1295, 1301 (5th Cir. 1978)). The district court found that the money paid by First National Bank "was repayable at an agreed time in fixed amounts equal to principal plus interest at the agreed rate." Record, vol. 8, at 1784. From this, the district court concluded that "the notes were not securities within the meaning of the Federal Securities Act." Id.

It is not entirely clear exactly what notes the district court was referring to in this statement. The Treasury Notes that Russell, Kennedy & Hodgden was purporting to sell were not short-term, thirty-day obligations reflective of a private loan between Russell, Kennedy & Hodgden and First National Bank. As described by the brokerage firm, they were scheduled to mature on February 15, 1978—not thirty days after the purchase. Finally, the Notes described by the brokerage firm were offered originally to a large class of investors. Purchasers and sellers of Treasury Bonds issued by the United States Government are entitled to the protection of section 10(b).[14] Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 10 n.6, 92 S.Ct. 165, 168 n.6, 30 L.Ed.2d 128 (1971). The plaintiff claims that Treasury Notes, which are identical in all relevant respects to Treasury Bonds,[15] should also fall within the definition of a security. Indeed, the defendants expressly concede that the Treasury Notes actually were securities. The defendants state that:

The district court did not base its decision upon a conclusion that, and Defendants-Appellees do not contend that, United States Treasury Notes fall outside the definition of a "security" in the 1934 Act. If the transaction in this case had been an outright sale of Treasury Notes from Russell to [First National] Bank, there is

operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**13.** Section 3(a)(10) provides:

Sec. 3. (a) When used in this title, unless the context otherwise requires—

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C.A. § 78c(a)(10).

**14.** Securities that are direct obligations of or that are guaranteed by the United States Government are exempted from various requirements of the 1933 Act and the 1934 Act. These exemptions, however, do not extend to the antifraud provisions of either Act.

**15.** The United States Treasury issues a number of different types of obligations to the investing public in order to finance its deficit and refinance its debt. The Treasury issues interest-bearing bills with maturities of up to one year, 31 U.S.C.A. § 754, interest-bearing notes with maturities from one to ten years, id. § 753, and interest-bearing bonds with maturities as long as thirty years, id. § 752.

no doubt that Section 10(b) would apply; but the transaction was more complex, involving a simultaneous agreement to "resell" the Treasury Notes in 30 days at the principal amount plus interest. Brief of Appellees at 14. It would appear then that no party on appeal contends that the Treasury Notes were not securities within the meaning of the 1934 Act.[16]

If the district court's finding that the "notes were not securities" was based upon an assumption that First National Bank received from Russell, Kennedy & Hodgden a thirty-day note representing the firm's repurchase obligation, then both the assumption and the fact finding were incorrect. There was no promissory note involved in this repurchase transaction. The only written instruments received by First National Bank were the two confirmations verifying the agreement to purchase and sell the securities. Whatever notes the district court was referring to in its memorandum opinion, its conclusion that the notes were not securities is incorrect.

The only remaining inquiry—and the inquiry addressed by the parties on appeal—is whether the district court properly granted summary judgment for defendants on the ground that there was no purchase or sale of a security in this transaction. Summary judgment is only proper when it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court is not entitled to choose one plausible inference over another by summarily trying fact issues. *Cole v. Chevron Chemical Co.*, 427 F.2d 390, 393 (5th Cir. 1970), *cert. denied*, 414 U.S. 858, 978, 94 S.Ct. 67, 300, 38 L.Ed.2d 109, 222 (1973); 6 Moore's Federal Practice ¶ 56.15[1.–0] (1976). *See American Telephone & Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir.) (on petition for rehearing), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). In determining whether a summary judgment is appropriate, the record is reviewed in the light favorable to the party opposing the motion, and the burden is on the moving party to show that there is no genuine issue of material fact before the court. *Pharo v. Smith*, 621 F.2d 656, 657, 664 (5th Cir.), *rehearing granted in part on other grounds*, 625 F.2d 1226 (5th Cir. 1980); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410–11 (5th Cir. 1980).

Section 3(a)(14) of the 1934 Act defines "sale" to "include any contract to sell or otherwise dispose of" securities. 15 U.S.C.A. § 78c(a)(14). Section 3(a)(13) defines "purchase" to "include any contract to buy, purchase, or otherwise acquire" securities. *Id.* § 78c(a)(13). This Court has noted that the terms "purchase" and "sale" are to be broadly construed to effectuate the purpose of the Act. *Herpich v. Wallace*, 430 F.2d 792, 806–07 (5th Cir. 1970). Whether a repurchase transaction is a purchase or sale is a question of first impression in this Circuit.[17]

---

16. That the securities were never owned or acquired by Russell, Kennedy & Hodgden does not preclude coverage by the 1934 Act. The antifraud provisions of section 10(b) and Rule 10b–5 have been held applicable even in situations when a broker-dealer purported *to sell* nonexistent securities or securities that were to be issued in the future. *See Lincoln Nat'l Bank v. Herber*, 604 F.2d 1038, 1040 (7th Cir. 1979); *Seeman v. United States*, 90 F.2d 88, 89 (5th Cir. 1937). "The fraud provisions are not defeated by the fact that a security purportedly traded is nonexistent or fictitious. . . . A contrary result would encourage rather than curb fraud." 1 A. Bromberg, Securities Law: Fraud—SEC Rule 10b–5, § 4.6, at 316 (1977).

17. Plaintiff cites *Hadsell v. Hoover*, 484 F.2d 123 (10th Cir. 1973), as precedent for a finding that a repurchase transaction is a purchase or sale sufficient to satisfy the jurisdictional prerequisite of section 10(b). That case, however, provides little or no guidance to this Court, since it appears that no party contested the existence of a purchase or sale in that case. Rather, the court focused on whether the facts and circumstances indicated that there existed a scheme to defraud. *See United States v. Erickson*, 601 F.2d 296, 300 n.4 (7th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 406 (1979).

Although a recent Fifth Circuit case, *Westchester County Sav. & Loan Ass'n v. Legel, Braswell Gov't Sec. Corp.*, 648 F.2d 321 (5th Cir. 1981), has, in a different context, charac-

674

In this case, the record indicates that Russell, Kennedy & Hodgden, a brokerage firm that engaged in the business of selling United States Government securities, deliberately structured the repurchase transaction as a sale and repurchase of Treasury Notes. The firm solicited First National Bank to invest in the securities. The parties executed no side agreements that would suggest that a sale was not contemplated or that First National Bank would not assume ownership of the securities.[18] Title, and all incidents of ownership, were apparently intended to pass to First National Bank. This Court has generally found section 10(b) to be applicable when there is a surrender of ownership or control of the security.

Bossier Bank contends that there was no purchase or sale in the instant case because the repurchase transactions were, in substance, loans. Defendants argue that the circumstances of the so-called sale must be examined to determine whether, in economic reality, the transaction was a sale. As a basis for this analysis, defendants rely upon the investment-commercial dichotomy that has been applied in this Circuit. This Court has applied the investment-commercial dichotomy in the context of examining whether a note falls within the definition of a security within the meaning of the securities acts. Thus, although the 1934 Act defines "security" as including "*any*" note, "judicial decisions have restricted the application of the Act to those notes that are

terized a repurchase transaction as a loan and pledge arrangement, that case did not decide that a repurchase transaction was not a "purchase or sale" for purposes of section 10(b). That case involved competing claims to the proceeds from the sale of two Government National Mortgage Association (GNMA) certificates. In that case, Legel, Braswell Government Securities Corporation (Braswell) filed a petition in bankruptcy on January 8, 1979. On January 15, 1979, Westchester County Savings & Loan Association (Westchester) filed a complaint to recover the GNMA certificates at issue. Irving Trust Company filed a counterclaim alleging a claim to the certificates superior to that of Westchester.

Westchester's claim to the certificates was based upon its position as registered owner of the certificates. Westchester pledged the certificates to Braswell as collateral security for two loans. The Court of Appeals characterized the transaction as follows:

The transfers of the GNMA certificates as collateral security were transactions in the form of repurchase agreements or "repos," pursuant to which Westchester sold the certificates to Braswell at a discount from their face amount subject to the right of Westchester to repurchase the same or equivalent securities 90 days hence at a higher price.

*Id.* at 324 (footnote omitted). Braswell then delivered the securities to Irving Trust for Braswell's dealer clearance account. Braswell informed Irving Trust that the certificates had been purchased from Thomson McKinnon Securities and that Irving Trust should pay McKinnon for the certificates from Braswell's account. The bankruptcy court held that Irving Trust's claim to the proceeds of the sale of the certificates was superior to Westchester's claim. Both the district court and the Court of Appeals affirmed.

In its summary of the facts of this case, the Court of Appeals stated, "A repurchase agreement or repo 'is essentially a short-term collateralized loan' although it is in the form of a sale." *Id.* at 324 n.5 (quoting *SEC v. Miller,* 495 F.Supp. at 467). Later, the Court stated that "[t]he use of repurchase agreements in connection with the pledging of government securities to secure underlying obligations between the debtor and the creditor is widespread." *Id.* 648 F.2d at 328. While both of these observations may be true, this does not answer the question whether a repurchase transaction is a "purchase or sale" within the meaning of section 10(b). *Westchester* did not involve the Securities Exchange Act of 1934. Although the *Westchester* Court did characterize the repurchase transaction as a loan with a corresponding pledge of collateral, that Court did not preclude a finding that, for purposes of section 10(b) and Rule 10b–5, a repurchase transaction could be considered a "purchase or sale." *See Cosmopolitan Credit & Inv. Corp. v. Blyth Eastman Dillon & Co.,* 507 F.Supp. 954 (S.D.Fla.1981) (Plaintiff claimed that defendant BEDCO aided and abetted in a 10b–5 violation in the context of a repurchase transaction. The district court did not address whether plaintiff was a buyer or seller of securities and therefore had standing to bring a 10b–5 action since the court found that BEDCO did not have the element of scienter necessary for aiding and abetting liability and had not provided the substantial assistance necessary for liability.).

18. That the securities were not delivered does not preclude a finding that a sale occurred. *See United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750–51, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975).

investment in nature and have excluded notes which are only reflective of individual commercial transactions." *McClure v. First National Bank of Lubbock,* 497 F.2d 490, 492 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Bellah v. First National Bank of Hereford,* 495 F.2d 1109, 1113–14 (5th Cir. 1974). The *McClure* Court concluded that:

> On one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the "any note" language of the exemption. On the other hand, the Act does not cover any *commercial* notes, no matter how long their maturity, because they fall outside the "any note" definition of a security. Thus, the investment or commercial nature of a note entirely controls the applicability of the Act, depriving of all utility the exemption based on maturity-length.

497 F.2d at 494–95 (emphasis in original). Defendants argue that the investment-commercial dichotomy is equally applicable to an examination of whether a transaction constitutes a sale.

To support its contention that the transaction was, in reality, a collateralized loan rather than a sale, Bossier Bank points to several factors that have generally been considered by this Court in applying the investment-commercial dichotomy. Thus,

Bossier Bank notes that: (1) First National Bank was obligated to resell the securities to Russell, Kennedy & Hodgden at a fixed principal amount plus interest. According to Bossier Bank, this indicates that First National Bank was not investing in the Treasury Notes since any gain or loss in the market value of the Notes would accrue to the brokerage firm and not to the bank.[19] (2) The resale obligation fell due on a fixed date after a relatively short term,[20] a factor that tends to characterize commercial lending rather than investment transactions. (3) The transaction was entered into with a lending institution[21] and was not offered to a large class of investors. *See All American Assurance,* 583 F.2d at 1301; *McClure,* 497 F.2d at 493–94. (4) The bank was not investing in the brokerage firm's operations. (5) The principal amount of the transaction was the par value of the Notes, which was less than their market value. According to Bossier Bank, if Russell, Kennedy & Hodgden had intended to sell the Treasury Notes, it could have obtained a higher price on the market.[22] (6) First National Bank was to earn interest on the Treasury Notes at a negotiated market rate that was different from the coupon rate of the Treasury Notes.

Defendants contend that these factors indicate that the transaction between First

---

**19.** The record evidence with respect to this contention is in conflict. There is no dispositive evidence that First National Bank was required to return the same Treasury Notes it purchased from Russell, Kennedy & Hodgden. Accordingly, if the market price of the Treasury Notes had increased sufficiently during the period they were owned by First National Bank, the bank might have been able to sell the Notes at a profit with the expectation that it could repurchase Notes of the same class at a lower price before it was required to deliver such Notes to Russell, Kennedy & Hodgden. This could not have been done with respect to the collateral for a loan in the absence of foreclosure and sale to satisfy the debt.

**20.** As stated above, in applying the investment-commercial distinction, this Court has not considered the 1934 Act's exemption for notes that are less than nine months in duration to be dispositive. 15 U.S.C.A. § 78c(a)(10). *All American Assurance,* 583 F.2d at 1300–02; *Reid v. Hughes,* 578 F.2d 634, 638 (5th Cir.

1978); *McClure,* 497 F.2d at 492–95; *Bellah,* 495 F.2d at 1111–14.

**21.** First National Bank contends that it is irrelevant to the characterization of this transaction that the buyer in this case was a bank. First National Bank maintains that the brokerage firm's customers were exclusively small banks and financial institutions that routinely purchased and sold Government securities for investment purposes, and that these customers typically had no investment departments of their own. Thus, according to the plaintiff, although First National Bank was a lending institution, it purchased securities from Russell, Kennedy & Hodgden for investment purposes.

**22.** There is, on the other hand, evidence in the record that the agreed upon purchase price approximated the market price of the notes at that time.

National Bank and Russell, Kennedy & Hodgden was commercial in nature and was therefore not a sale within the meaning of the 1934 Act. It is true that this Court has recognized that the "securities acts have as their fundamental purpose the protection of *investors.*" *McClure,* 497 F.2d at 495 (emphasis added). *See Shores v. Sklar,* 647 F.2d at 470. In determining whether a transaction is a sale, however, this Court has examined such factors as whether the transaction affects the securities industry, *McClure,* 497 F.2d at 495, and "whether the purposes of section 10(b) of the Exchange Act and Rule 10b–5 thereunder would be advanced by their application" to the transaction. *Herpich,* 430 F.2d at 812. Thus, it would appear that the factors pointed out by Bossier Bank are not dispositive of the issue before this Court.

Regardless of the extent to which the factors identified by Bossier Bank relate to the question whether this repurchase transaction constituted a sale, the summary judgment rendered by the district court was improper. A fact finder could have found that the repurchase transaction in this case was a purchase or sale. Since genuine issues of material fact as to the proper characterization of this transaction did exist,[23] summary judgment was improper.[24]

The order granting summary judgment for defendants and dismissing plaintiff's

pendent state law claims is vacated. The case is remanded for further proceedings.

VACATED AND REMANDED.

---

**23.** Although this is not intended to be an exclusive list of existing issues of material fact, there is conflicting evidence as to whether First National Bank was required to resell to Russell, Kennedy & Hodgden the same Treasury Notes that it purchased from the brokerage firm. In addition, the evidence as to whether title and control of the securities was intended to pass and whether the purchase price of the securities was the same as the market price is inconclusive.

**24.** In reaching the conclusion that summary judgment for the defendants was improper in this case, we express no opinion on whether a court could find that, as a matter of law, a repurchase transaction is a purchase or sale within the meaning of the 1934 Act.

Since we decide that summary judgment was improper, we need not address First National Bank's contention that, even if this transaction was a collateralized loan and not a sale, in view

of the Supreme Court's recent decision in *Rubin v. United States,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), a pledge of United States Treasury Notes would constitute a contract to sell or otherwise dispose of a security within the meaning of § 3(a)(14) of the 1934 Act. In *Rubin,* the Supreme Court held that a pledge of stock to a financial institution as collateral for a commercial loan constituted an offer or sale of the security within the meaning of § 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a). While plaintiff maintains that *Rubin* requires a reversal of the Fifth Circuit's position that a pledge of a security does not constitute a purchase or sale for purposes of § 10(b) of the 1934 Act, defendants contend that *Rubin* has left this Circuit's position with respect to pledges for purposes of § 10(b) unaffected. We need not decide this question in the context of this case.