**Thomas TEW, as Trustee for the Estate of E.S.M. Government Securities, Inc., Plaintiff,**

v.

**The CHASE MANHATTAN BANK, N.A., Defendant.**

**No. 88–6728–CIV–JAG.**

United States District Court, S.D. Florida, Fort Lauderdale Division.

Jan. 22, 1990.

**1554**

Jose Garcia–Pedrosa and Kathy Gibbs, Tew Jorden and Schulte, Miami, Fla., for trustee.

Russell Brooks, Milbank, Tweed, Hadley & McCloy, New York City, and George H. Bailey, Jones, Foster, Johnson & Stubbs, P.A., West Palm Beach, Fla., for defendant.

### ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the court upon the cross-motions for summary judgment filed by the parties. Pursuant to Federal Rule 56, the plaintiff Thomas Tew ("Tew" or "the trustee") moves for entry of judgment in his favor on the defendant Chase Manhattan Bank's two counterclaims and affirmative defenses three through eleven. Chase Manhattan Bank ("Chase" or "the bank") also moves for summary judgment on each count of the complaint. The parties have fully briefed the motions and they are ripe for decision.

This court can only enter summary judgment on a claim or defense if there is no genuine issue of fact outstanding and the movant is entitled to judgment as a matter of law. The nonmovant may avoid summary judgment only by meeting this standard and coming forward with admissible evidence as to each and every element of the claim or defense at issue. All evidence is to be viewed in the light most favorable to the nonmovant, resolving all conflicting inferences against the movant. If reasonable jurors could differ as to the evidence and the inferences to be drawn therefrom, the court should allow the parties to proceed to trial.

■ Reliance on mere allegations and conclusory statements in the pleadings is insufficient. The movant has the initial burden of demonstrating what elements of the opposing party's case are deficient by presenting evidence in the form of affidavits, depositions, or other discovery. If the movant is not in the best position to have evidence on a particular issue, an element may be negated by circumstantial evidence negating the claim or defense. The opposing party, with better access to such evidence, is then expected to produce the direct evidence showing a genuine issue of fact. *See Avirgan v. Hull,* 691 F.Supp. 1357, 1369 (S.D.Fla.1988); *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.

1986). Once the movant comes forward with evidence, the nonmovant must also produce sufficient proof of its claim, rather than merely resting on general denials in a pleading.

■ Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontraverted proof of a "smoking gun". Viewing all the circumstances, a reasonable fact finder will have to hear all the evidence, weigh it and draw all reasonable inferences therefrom, and judge a witness' credibility prior to determining such issues.

The trustee, in his capacity as representative of the bankrupt estate of E.S.M. Government Securities, Inc., is suing the defendant bank here for its alleged misconduct in relation to the E.S.M. fraud. This fraud was committed by E.S.M.'s officers and directors against its customers and outside creditors. These managers were selling government securities to investors subject to repurchase agreements and then using these same securities to collateralize loans through clearing banks. Chase was one of three banks which cleared securities for E.S.M. The complaint alleges claims for fraud, civil conspiracy to defraud, aiding and abetting fraud, breach of fiduciary duty and breach of contract. Chase counters with affirmative defenses and two counterclaims. Chase's defenses numbered three through eleven seek to hold the trustee responsible for the misconduct of E.S.M.'s former officers and directors who committed a massive fraud against E.S.M. customers and creditors. The two counterclaims are rooted in theories of breach of contract and fraud. For damages under these claims, Chase seeks to recover its attorneys' fees and costs associated with defending this case and certain litigation brought against the bank by Fidata Corporation in the United States District Court for the Southern District of New York. *See Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F.Supp. 1252 (S.D.N.Y.1988) (Leval, J.).

Preliminarily, it should be noted that all of the employees of Chase involved with Government deny any knowledge of either the double hypothecation of the securities or of Government's insolvency. The bank points out that many of these employees are no longer working for Chase and therefore, have no interest in this litigation. For the reasons given below, this court finds Chase's reliance on these conclusory affidavits to be unavailing. First, a reasonable jury could disbelieve these individuals. As for their alleged disinterest, a reasonable inference would be that no person would admit that he was fooled by the E.S.M. principals. The jury could also find that the witnesses have an interest in being less than candid in that any admission as to knowledge of the fraud or improper banking practices could damage the witness' credibility in their present profession. While this court draws no such inferences, these comments merely demonstrate that Chase's reliance of these affidavits requires an examination of credibility. Based on the procedural posture of a Rule 56 motion, it is improper to weigh the evidence by judging the credibility of witnesses. If a reasonable jury could believe either party's version of the facts and the inferences to be drawn therefrom, the case must be tried.

As true with any good story, there is more than one version of the facts in this case.

On or about May 21, 1981, E.S.M. Government Securities, Inc. (Government) entered a relationship with Chase as its clearing bank. Chase was to clear GNMA securities, subject to reverse repurchase agreements, through Government's account. The bank processed the securities based on oral instructions over the telephone relayed by Government and followed up with written confirmation tickets. The securities were pledged by Government as collateral for a line of credit, even though they, in fact, belonged to Government's customers, not itself. Chase gave Government an initial loan limit of $25 million dollars which was increased to $50 million dollars in 1982.

At this point, the parties' agreement as to the facts ends. Chase alleges that it believed the securities in Government's account were legally proper collateral. Tew alleges that the bank knew that the securities were double hypothecated. A former clerk of the bank, Carolyn Denmark, testifies that she was told by Government representatives on several occasions between May 1982 and June 1983 to "hold" certain securities for the benefit of Government customers. She marked the confirmation tickets for these securities with a "hold" designation. Chase asserts that this cannot be true based on the testimony of a former Government employee responsible for clearing securities with Chase, Stan Wolfe, who states that he never told Chase that it was holding customer securities and that he believed all securities being sent to Chase were legally proper collateral. However, there is no proof that Wolfe was the exclusive representative for Government in its dealings with Chase. Moreover, based on Denmark's testimony, a reasonable jury could conclude that someone must have told Denmark about the customer securities, even if it was not Wolfe.

The securities of Government's customers were not placed in a segregated account as neither Chase or Government set up such an account. Each party asserts it was the other's obligation to establish a segregated account to hold customer securities not available as collateral for the loans. Chase alleges that there is no evidence that the customer securities were placed in Government's account and thereby, used as collateral for loans by Chase. However, it is undisputed that Chase did receive these securities and held them somewhere. Denmark testified that they were placed in Government's account. Even without this evidence, Chase is in the best position to know what happened to them. The bank's failure to present this proof is at least prima facie evidence that the securities were commingled in Government's account. Whether the GNMAs were segregated or commingled is a question of fact for the jury.

Government told several of its customers that their securities were being held in a segregated account at Chase. Chase denies any knowledge as to these representations and there is no evidence that any Government customer directly contacted Chase and was told of a segregated account.

Tew alleges that Chase was "sensitized" to the risks of doing business with "little known and thinly-capitalized" government securities dealers no later than December 15, 1982. Chase does not deny knowledge of fraudulent incidents involving the securities dealers of Drysdale, Comark, and Lombard–Wall. Indeed, Chase suffered significant losses as a result of dealing with these parties. However, it points out that the clearing industry, not just itself, took notice of these financial debacles. Moreover, Chase argues that this sensitivity was inapplicable to Government since the bank believed its customer was worth over $25 million dollars, based on reviews of Government's unaudited financial statements.

Tew contends that Chase actually knew of the E.S.M. fraud by 1983. In that year, Joseph Hanley took over and reviewed Government's account for Chase. The trustee contends that Hanley discovered how the fraud was being perpetrated. Government was just one of several E.S.M. companies. Hanley knew of the existence of at least two of these, E.S.M. Government Securities, Inc. and E.S.M. Group, Inc. ("Group"). The E.S.M. officers and directors responsible for the fraud were able to preserve the appearance of Government's profitability until 1985 by transferring all of its losses to the books of other E.S.M. entities including Group. Tew contends that Hanley first suspected this scheme when he realized there were significant transfers of funds between the E.S.M. companies, based on his review and understanding of the unaudited financial statements for Government and Group.

According to the trustee, Hanley then discussed this matter with Government, probably through Alan Novick, an E.S.M. principal who was participating in the fraud. It is undisputed that Novick forwarded an unaudited financial statement for Group for 1982, cautioning Hanley to

treat the document as confidential. He also sent Hanley a copy of an unaudited statement for Government for the same year. Tew contends that the documents show the fraud, on their face, and that Hanley had to know about the insolvency of Government.

Chase disagrees. It contends Hanley did not give any credence to the unaudited statements and insisted that Novick furnish audited financial statements and a guaranty from Group. According to Chase, when he received neither, Hanley decided to terminate the relationship with Government. Of course, this lack of reliance is contradictory to Chase's position above that Hanley relied on the statements to assess Government's net worth.

To show Hanley's knowledge, Tew relies upon the financial statements and the testimony of his expert, D. Jack Goldstrich. Chase contends that Goldrich's opinion is not based on facts, is conclusory, and is based on facts from all five E.S.M. companies which were not available or known to Hanley.

On their face, the financial statements indicate that Government was a "wholly-owned subsidiary" of Group. Moreover, Joseph Hanley was a not an unsophisticated lay person, but a banking supervisor for a clearing account involving government securities subject to complex repo transactions for a national bank. Note D of the 1982 Financial Statement of Government explicitly states that the company had "agreements with an affiliated company [Group] for securities purchased under agreements to resell amounting to approximately $516,656,000.00 and securities sold under agreements to repurchase amounting to approximately $222,267,000". Even to a lay person, this statement would put the reader on notice that to assess the true worth of Government, one had to see the financial statements of Group. Beyond that, the court shall decline the invitation of Chase to determine now that the statements did not show that Government was insolvent or that Hanley knew the true condition of the E.S.M. companies. Questions of knowledge should be determined by a review of all the circumstances. Further, this court is not a banker. What a banker may or may not know or understand from a complicated financial statement is an issue of fact. A reasonable jury could find from this evidence that Hanley knew about the fraud by 1983 and realized that Government was insolvent.

On June 29, 1983, a meeting occured in Fort Lauderdale, Florida between Hanley and his assistant, Frank Sodano, and Alan Novick. Out of that meeting, Hanley authored a memorandum which Tew asserts is the evidence of the agreement between Chase and Novick to cover up the fraud. The memorandum notes that Chase was "revamp[ing]" its GNMA processing. Chase contends that it had decided to terminate the clearing of such securities because of their unprofitability. Hanley further explained that Chase's decision to terminate its relationship was based on the fact that Government's "borrowing patterns and the use of customer's securities as collateral were not what we would consider a normal clearing transaction." Novick then allegedly revealed a financing program he was transacting with Midland Commodities, Inc. and requested that he be given 90 to 120 days to disengage because "an immediate cut could cause substantial losses in their position". Chase then agreed to the 90 to 120 day delay and indicated that the usual amount of time given was only 30 days.

Hanley also noted that "intercompany transactions [between the E.S.M. corporate entities] appeared to be sizeable and frequent and as such lead us [Chase] to require audited financial statements of both the parent and subsidiary together." The memorandum closes with the comment that the disengagement was to be "handle[d] in very low key, fashion as not to create rumors on the street" and that the unaudited financial statements would be returned to Novick after the relationship was terminated.

Tew relies upon this memorandum to draw the inference of fraud. On its face, it shows that Hanley knew about the intercompany transfers by the E.S.M. compa-

nies and explicitly notes that Government was using customer securities for collateral.

Chase draws conflicting inferences from the Hanley memorandum. As to the usual borrowing patterns, Chase alleges that Hanley was concerned that Government was using the account as a source of financing, rather than as a conduit to move securities. Unlike many clearing accounts, Government's balance did not show the wide fluctuations usually experienced. Also, the bank contends that the memo merely shows that Hanley persisted in his earlier demand for audited financial statements and a guaranty from Group. There is no explicit statement by Hanley that he knew Government was insolvent. Chase argues that "[n]o prudent banker should have retained Government as a customer without having an [sic] certified financial statement and a guaranty of the affiliate with which Government's certified financial statement disclosed Government was conducting large intercompany transactions." *See* Chase's Reply at 7. A contrary inference can also be drawn. If these statements were really so necessary to Chase's credit decisions, why did the bank extend a credit line exceeding $50 million dollars *before* it received these audited statements. This court finds that the Hanley memorandum presents sufficient facts that a reasonable jury could either believe Chase's version of a legitimate credit decision or accept the trustee's inferences that the memorandum is a mix of half-truths evidencing Chase's knowledge of the E.S.M. fraud and an agreement to conceal it.

Tew does not rely merely upon Chase's failure to reveal the fraud, however. The complaint also alleges affirmative acts allegedly performed by Chase to actively conceal the facts. The trustee first relies upon a letter to Novick from Hanley dated July 1, 1983 wherein Chase stated that pursuant to the parties' "mutual[ ] agreement", the bank had decided to discontinue clearing GNMA securities. Tew claims that the letter was given to mislead E.S.M. customers, although there is no evidence that it was actually shown to any particular customer or creditor.

Tew asserts that a reasonable jury could find that the letter was a fraud. Contrary to its assertion, the disengagement decision was made by Chase alone. Further, Chase's alleged decision to discontinue clearing GNMA's after July 1983 was false. In fact, Chase continued to clear this type of security after terminating its relationship with Government. There is also evidence that the clearing of GNMA's, contrary to the assertion of Chase, was profitable. In the case of E.S.M., Chase earned $3.5 million dollars in interest on the loans made to Government.

Tew also relies on the fact that Hanley gave Novick an extended amount of time to end the relationship. To the extent this was not a usual concession, a reasonable juror could conclude Hanley acted to conceal the fraud by giving Novick an extra 30 to 60 days to disengage. Chase contends that this fact is inconclusive in that Chase itself had no set policy as to the period allowable for ending clearing activities. Moreover, Hanley's statement, argues Chase, should be considered in the context of Novick's expressed involvement with the Midland program. Even if GNMAs were cleared after the disengagement with Government, Chase contends that this does not necessarily negate the existence of a plan by Chase to eventually terminate its involvement with such securities. Finally, in light of the sensitivity to the market in 1983, Hanley may have assumed that a gradual termination was reasonable, without necessarily condoning a fraud. While all of these factual inferences may be true, it is not for this court to resolve such a dispute. In the case of fraud, parol evidence is admissible to show the meaning of ambiguous or misleading words of phrases in a document. The Hanley memorandum is susceptible to both the interpretations suggested by Tew and by Chase. It is for the jury to decide which party is truthful based on who they find most credible.

In August 1983, Government's credit line was reduced to zero and the parties completed disengagement by October 1983. Alan Novick died in November 1984 and

the E.S.M. fraud was revealed in March 1985.

As to the trustee's motion for summary judgment on Chase's affirmative defenses and counterclaims, there are additional facts at issue.

Tew contends that the evidence shows that the officers and directors of the E.S.M. companies including Government and Group looted the corporations and ran them solely for their own personal benefit. Based on the testimony of Ronnie Ewton, the E.S.M. principals made personal loans to themselves for personal expenses when they lacked the ability to repay and at a time when E.S.M. was insolvent. Tew also asserts other ways that the officers and directors acted adversely to the interests of E.S.M. They borrowed money at higher interest rates and in greater amounts than E.S.M. earned to finance their loans to perpetuate the fraud. In addition to the loans, the principals paid themselves huge salaries and bonuses.

Chase asserts that there is a factual issue as to the adverse interest of the E.S.M. principals. The bank argues that it "will prove *at trial* that Government was the primary beneficiary—not the victim—of management's fraud." *See* Chase's Response at 6 (emphasis added). To support this assertion, Chase alleges that the officers and directors of E.S.M., who were allegedly all part of the fraud, also represented all of the companies' shareholders. The bank further contends that E.S.M. was never legitimate or profitable and that it never acquired assets except through fraudulent activity.

Chase's allegations are unsupported. Despite this court's prior knowledge on what actually occurred in the fraud, the trustee's earlier motion to strike the affirmative defenses and counterclaims as pertaining to the misconduct of the E.S.M. principals was denied. Chase was given an opportunity and a fair chance, as it argued for in its brief, to discover facts to support its theory that E.S.M. was an "engine of theft" against outsiders. Now, in the posture of a motion for summary judgment,

Chase asks this court to once again delay a decision until trial.

On this record, the evidence is clear that the E.S.M. principals acted adversely to the interests of their companies. Chase offers mere allegations, unsupported by any facts or based on inference, that the directors and officers of E.S.M. also represented 100% of the shareholders. Moreover, the bald assertion that the companies were never profitable or obtained legitimate assets is not only unsupported by *any* proof, but is contrary to the facts. As to this issue, Chase's time to fish or cut bait has certainly arrived.

The trustee moves for summary judgment against Chase as to its affirmative defenses three through eleven and on its two counterclaims.

His first argument is that the adverse interest exception bars Chase's assertion of any defense or claim based on the former misconduct of the E.S.M. principals. For the reasons stated above, the court finds that there is no genuine issue of material fact as to the actions of the officers and directors. They ran E.S.M. into the ground and robbed the corporate entity for their own aggrandizement. As noted by one court, with friends like these, E.S.M. certainly had nothing to fear from its enemies. *See Schacht v. Brown,* 711 F.2d 1343, 1348 (7th Cir.1983).

Even assuming Chase had factual support for its "engine of theft" theory, it would fail as legally insufficient in this case.

■ Normally, the acts and knowledge of an agent are imputed to the principal. In the case of a corporation, it can only act through its agents. Therefore, the rule is that the actions of corporate directors and officers are attributable to the corporate entity. Such is true also in the case of a trustee or a receiver who serves as a representative of a bankrupt company. *See Armstrong v. McAlpin,* 699 F.2d 79, 89 (2nd Cir.1983); *Matter of Gebco Inv. Corp.,* 641 F.2d 143, 146 (3rd Cir.1981); *In Re Best Pack Seafoods, Inc.,* 29 B.R. 23, 24 (Bankr.Maine 1983).

As with almost all rules, there is at least one exception. If the agent is acting adversely to the principal's interests, the knowledge and misconduct of the agent are not imputed. The law does not presume that the wrongdoer would perform his usual duty of disclosing all material facts regarding his action if such disclosure would reveal his fraud.

The trustee asserts that Florida law applies to this issue and the bank relies upon the substantive law of the state of New York. Pursuant to *Klaxon Co. v. Stentor Electrical Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this court must apply the choice-of-law rules of the forum state, Florida. The issue to be decided is whether the tortious misconduct of corporate officers and directors is to be imputed to the corporate entity, or its representative in bankruptcy. If the issue is treated as a matter of tort law, Florida law requires application of that state's law which has the most significant relationship with the particular issue. *See Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla.1980). Here, Florida has the greatest connection with the events and the parties. The E.S.M. companies and its principals were residents and domiciliaries of this state as is the trustee of the bankrupt estate. The alleged misconduct occured in Florida at E.S. M.'s office in Fort Lauderdale. Chase contends otherwise, but offers no factual support as to the significance of any New York contacts.

If the issue is treated as a matter of agency or corporation law, Florida law will also apply. An individual's status, natural or corporate, is usually governed by the law of the state of domicile. Should Florida law require use of the more modern inquiry focusing on the significant contacts with the states, Florida law would still apply for the factual reasons above.

Under Florida law, the adverse interest exception applies and will bar Chase's reliance on the misconduct of the former officers and directors. *See Graves v. Iowa Mutual Insur. Co.,* 132 So.2d 393 (Fla.1961); *also see Federal Deposit Insur.*

*Corp. v. Lott,* 460 F.2d 82, 88 (5th Cir. 1972). However, even if New York law governed, the same result would follow. The only difference in New York is that the exception is more narrowly construed. As noted in the case of *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784–85, 488 N.E.2d 828, 830, 497 N.Y.S.2d 898, 900 (1985), an agent only has a legally sufficient adverse interest if he totally abandons the principal's interests as opposed to a mere conflict of interest. Even under this standard, the facts of this case show much more than a mere conflict of interest between Government and its officers and directors. For the reasons stated above, the court finds that the E.S.M. principals acted solely for their own personal enrichment, totally abandoning the interests of Government.

For this same reason, the adverse interest exception also bars Chase's two counterclaims. These are based on the fraud and breach of contract by the former E.S.M. officers and directors. They cannot be applied to bar the suit of the trustee of Government.

Chase's reliance on the case of *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982), is unavailing. First, there are no Florida cases mandating application of the case. Further, the rationale and holding of the case are unpersuasive here. In *Cenco,* some of the corporation's management engaged in a fraud aimed at inflating the market price of the corporation's stock. The inflated stock was used to buy other companies. Cenco benefitted from the acquisition of these corporations and by being able to borrow money at lower interest rates than its true value merited. Also, Cenco recovered excess amounts from insurers based on claims for the loss of nonexistent inventory.

In the case at bar, E.S.M. was a mere conduit for all the monies flowing from the companies' securities business. In *Cenco,* the corporation itself benefitted monetarily at the expense of outside insurers, banks, and owners of the acquired companies. Profitable companies were added to Cenco, cheap loans were obtained, false claims for

insurance were paid, and the price of the corporation's stock was inflated. Here, none of the E.S.M. companies retained the profits of the fraud. They were all channeled to the directors and officers via lavish salaries, bonuses, and loans. The E.S.M. companies were destroyed while its principals preyed on any victims unlucky enough to do business with them.

Furthermore, the rationales, underlying *Cenco* are inapplicable here. As explained in the later decision of *Schact v. Brown*, 711 F.2d 1343 (7th Cir.1983), a case coming out of the same circuit as *Cenco*, the earlier decision was based upon two considerations: (1) whether the eventual recovery would compensate the victims of the fraud, and (2) whether such a recovery would deter future wrongdoings. *Id.* at 1348. In this case, it is undisputed that all of the former directors and officers of the E.S.M. entities have transferred their interest to the trustee. Any recovery from Chase will benefit the creditors of the estate, not the wrongdoers. Moreover, if the trustee is able to recover his damages in the sum of approximately $70 million dollars, clearing banks will certainly be more diligent in dealing with government securities dealers. To the extent the jury believes Tew's allegations that Chase also actively participated in the fraud, the entire banking industry should be deterred from future fraudulent activity given the high cost.

The trustee originally moved to strike the counterclaims as improper indemnification claims. Abandoning that position before it was ever asserted, Chase asserted that its recovery under the counterclaims was based on the wrongful act doctrine.

▪ Normally, a party cannot recover attorneys' fees for defending suits. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, if the wrongful act of a defendant involves an individual in litigation with a third party, that individual may bring an action against the defendant to recover his attorneys' fees and costs associated with the earlier defense. *See Baxter's Asphalt & Concrete, Inc. v. Liberty County*, 406 So.2d 461, 467

(Fla. 1st DCA 1981), *quashed on other grounds*, 421 So.2d 505 (Fla.1982); *Shindler v. Lamb*, 25 Misc.2d 810, 812; 211 N.Y.S.2d 762, 765 (Sup.Ct.1959), *aff'd*, 10 A.D.2d 826, 200 N.Y.S.2d 346 (1st Dept. 1960), *aff'd*, 9 N.Y.2d 621, 172 N.E.2d 79, 210 N.Y.S.2d 226 (1961).

In this case, Chase asserts that it is entitled to a recovery of attorneys' fees and costs for defending against counterclaims raised by Fidata Corporation in litigation conducted before the Honorable Pierre Leval, District Judge, in the Southern District of New York, case number 87–Civ–4844(PNL). The counterclaims also seek to recover the fees and costs associated with the defense of the trustee's claims here.

▪ The counterclaims are improper for several reasons. First, even if Chase could recover under the wrongful act doctrine for its expenses in the *Fidata* litigation, it could not recover for its defense here. In a direct action by the wronged party against the defendant who caused involvement in the litigation with the third party, the American Rule applies. *See Auto–Owners Ins. Co. v. Hooks*, 463 So.2d 468, 477–78 (Fla. 1st DCA 1985); *Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 496, 384 N.Y.S.2d 804, 807 (1st Dept.1976); *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2nd Cir.1986); *Ranger Const. Co. v. Prince William County*, 605 F.2d 1298, 1304–05 (4th Cir.1979). Second, it is undisputed that Chase was sued by Fidata and the trustee here for the bank's own misconduct. Contrary to the bank's argument, the determining factor is the allegations in the pleadings of Fidata and Tew. The fact that Chase prevailed in the earlier case and may eventually win here is irrelevant. Both claims against Chase involve the bank's *own* alleged involvement in the E.S.M. fraud by allegedly participating and concealing it.

▪ Finally, Chase is attempting to bootstrap an award of attorneys' fees and costs on two counterclaims rooted in unrelated theories of liability. These types of expenses are not proper damages in actions based on breach of contract or fraud. *See*

*In Re Clayton,* 9 B.R. 5, 9 (Bankr.S.D.Fla. 1980) (applying Florida law); *State Farm Fire & Casualty Co. v. Pritcher,* 546 So.2d 1060, 1061 & n. 2 (Fla. 3rd DCA 1989); *Martin v. Paskow,* 339 So.2d 266, 268 (Fla. 3rd DCA 1976) (damages in fraud cases). Because the misconduct of the former officers and directors is not imputed to the trustee here, Chase cannot show the wrongful act contemplated by the exception. The bank does have a remedy, but not against this party. Chase must look to the former officers and directors of E.S.M., to the extent allowed by bankruptcy law (if at all), to recover.

 Lastly, Chase argues that it has a contractual right to recover its costs and attorneys' fees for this and the *Fidata* litigation.

Novick and Chase entered into a Special Agreement dated May 21, 1981 in regards to the hypothecation of customer securities. Paragraph 3 of that agreement incorporates all previous "Insturments" executed by the parties. One such insturment was the Security Agreement signed on the same date.

Pursuant to the last paragraph of the Security Agreement, the parties' contract is to be construed under the substantive law of New York. *See Dept. of Motor Veh., Etc. v. Mercedes–Benz, Etc.,* 408 So.2d 627, 629 (Fla. 2nd DCA 1981); *as modified on other grounds,* 455 So.2d 404 (Fla. 2nd DCA 1984). Paragraph five of the Agreement also contains the following language:

> The undersigned [Government] will pay to the Bank all expenses (including expense for legal services of every kind) of, or incidental to, the enforcement of any of the provisions hereof or of any of the Liabilities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Security or receipt of the proceeds thereof, and for the care of the Security and defending or asserting the rights and claims of the Bank in respect thereof, by litigation or otherwise, including expense of insurance; and all such ex-

penses shall be indebtness within the terms of this agreement.

In paragraph two of the same agreement, the term "Liabilities" is defined to include:

> all indebtedness, obligations and liabilities of any kind of the undersigned to the Bank and also to others to the extent of their participations granted to or interests herein created or acquired by them by the Bank, now or hereafter existing, arising directly between the undersigned and the Bank or acquired outright, conditionally or as collateral security from another by the Bank, absolute or contingent, joint and/or several, secured or unsecured, due or not due, contractual or tortious, liquidated or unliquidated, arising by operation of law or otherwise, direct or indirect, including without limiting the generality of the foregoing, indebtedness, obligations and liabilities to the Bank of the undersigned as a member of any partnership, syndicate, association or other group, and whether incurred by the undersigned as principal, surety, indorser, guarantor, accomodation party or otherwise.

The parties also entered into a Clearing Agreement signed by Alan Novick and accepted by Chase on July 24, 1981. Paragraph eight of the agreement provides that Government would be responsible "for all expenses, taxes, costs of funds used or other charges or liabilities" incurred by Chase "in connection with the Account". Paragraph 12(b) provides that Chase "shall be protected in acting upon the ... instructions ... reasonably believed ... to have been given by an authorized representative of ... [Government]." Furthermore, paragraph 12(d) states:

> "In the event of any dispute between or conflicting claims by ... [Government] and any other person or persons with respect to the securities and other property in the Account, [Chase] ... shall be entitled ... to receive[ ] security or an indemnity satisfactory to ... [Chase] ... save you harmless against any and all loss, liability or expense (including, but not limited to, attorneys' fees) which you may incur by reason of your acting."

Finally, the parties agreed to paragraph 13 which provides that Government

> covenants and agrees to indemnify ... [Chase] for, and to hold you harmless against, any loss, liability and expenses (including attorneys' fees) relating to claims, demands, actions or proceedings arising out of or in connection with the acceptance or administration of this Agreement, including without limitation the costs and expenses of defending yourself against any claim of liability hereunder *except such claims, demands, actions or proceedings as are the result of your gross negligence or willful misconduct.* (emphasis added).

If Chase is to recover its attorneys' fees and costs, it must look to the Security Agreement. The parties' Special Agreement contains no separate attorneys' fees provision and merely incorporates the Security Agreement by reference. In terms of the Clearing Agreement, any recovery of legal expenses is conditioned, under paragraph 13, to those situations where Chase is not sued for its own misconduct. Because the trustee here is suing the bank for intentional and reckless fraud, the exclusion certainly applies. The same holds true of the *Fidata* litigation.

In construing the language of the Security Agreement, the court is required to make a reasonable interpretation of the contract. *See Friedman v. Egan*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (N.Y.App.Div. 1978). Of course, the ultimate goal is to discern and effectuate the intention of the parties. *Id.*, 64 A.D.2d at 76, 407 N.Y.S.2d at 1005.

Based on the common law of New York, the contractual clause is certainly broad enough to include the expenses sought here. However, as is true of all contracts, the agreement at issue must be legally enforceable to obtain judicial relief. Here, to the extent that the contract clause indemnifying Chase was so broad as to include intentional torts and criminal acts, it is invalid. Public policy precludes enforcement of any agreement whereby one party agrees to indemnity for costs and attorneys' fees arising out of the commission of

an intentional tort such as fraud against a third party. Here, the bank is being sued for its own alleged misconduct in concealing and participating in the E.S.M. fraud. The counterclaims in the *Fidata* litigation also rested on the same theory. Hence, the clause in the Security Agreement violates public policy to the extent it illegally allows indemnity for the commission of a fraud. The bank could have drafted an exclusion in the contract to account for this ambiguity. However, this was not done and a contractual document is construed against its maker unless there is other evidence of contractual intent. In this case, the Clearing Agreement contains an exclusion for claims against Chase for "gross negligence or willful misconduct". There is no other evidence that the parties intended not to follow this exclusion in their Security Agreement. The court finds that this is the only reasonable reading of the contract based on considerations of the parties' intent and the dictates of public policy.

Chase also moves for summary judgment on all five counts of the complaint. The trustee is suing the bank on five theories: Fraud and Deceit (count I), Conspiracy to Defraud (count II), Aiding and Abetting Fraud (count III), Breach of Fiduciary Duty (count IV), and Breach of Contract (count V).

■ The trustee's action is hinged on the fraud claim in count I. There is an initial issue of what substantive law applies to this claim. As noted above, Florida choice-of-laws requires application of the law of the state with the most significant relationship to the issue.

Because, the issue involves the tort of fraud, the site of the wrong and the injury are important considerations. Here, the tort was centered in Fort Lauderdale, Florida at E.S.M.'s office. It was there that the former officers and directors initiated and perpetuated the fraud. Chase Manhattan was contacted from Florida via written correspondence and telephone calls. Further, as noted in the parties' Clearing Agreement, Chase was merely an agent for Government. To ascertain the instructions given to the clearing bank, an inquiry must

be directed at Government. Granted, the injury here encompassed victims around the nation including New York. But, even though the victims are of diverse citizenship, the locus of the harm was in Florida. Of course, the E.S.M. companies were all Florida corporations, doing business in this state, and all their officers and directors were Florida citizens. Certainly, Florida has an interest in punishing fraudulent actions committed by corporate entities and principals doing business here. It is also revealing here that the Chase employees, Hanley and Sodano, flew to Florida to terminate the clearing relationship, rather than Novick traveling to New York. While the parties did contract to apply New York law in the interpretation of their contract, there is no evidence that they ever envisioned what state's law would govern the tortious conduct of either party. Therefore, based on all the above factors and the policies and contacts listed in Restatement (Second) of Conflicts of Laws, sections 6 and 145–147 (1971), the court finds that Florida has the most significant relationship to the fraudulent activities at issue.

To prevail on a claim of fraud under Florida law, the plaintiff must establish the following elements: (1) a false representation as to a material fact, (2) the defendant actually knew or should have known that the representation was false, or that the defendant made the representation recklessly without knowledge as to its truth or falsity, (3) the plaintiff reasonably and actually relied upon the representations, (4) the plaintiff incurred foreseeable damages, (5) caused by the defendant's representations. *See Banco Nacional De La Vivienda v. Cooper,* 680 F.2d 727, 730 (11th 1982) (applying Florida law and citations omitted).

Contrary to Chase's argument that fraud must be shown by clear and convincing evidence, Florida law only requires proof by a preponderance of the evidence on this claim. *See Wieczoreck v. H & H Builders, Inc.,* 475 So.2d 227 (Fla.1985); *Watson Realty Corp. v. Quinn,* 452 So.2d 568 (Fla.1984).

Chase focuses on two issues critical to the trustee's claim: whether the bank knew or should have know of the E.S.M. fraud and whether the damages alleged in the complaint are proximately related to the alleged misconduct.

Based on the above discussion, the trustee has alleged sufficient facts which could support an inference that Chase Manhattan actually knew about the E.S.M. fraud and acted to conceal it. Without repeating the facts here, a reasonable jury could infer actual knowledge from, *inter alia,* the Hanley memorandum, the possession of the unaudited financial statements, the disengagement letter, the extra time given to Government to terminate the relationship, and the sensitivity of the bank and the clearing industry to the potential for fraud in government securities.

Tew has also alleged sufficient evidence to raise a factual issue whether the bank acted recklessly. Under Florida law, making a representation, which is later determined to be false, and is made without regard to the truth or falsity of the representation, will support a fraud claim. *See Joiner v. McCullers,* 158 Fla. 562, 28 So.2d 823 (1947); *Upchurch v. Mizell,* 50 Fla. 456, 40 So. 29 (1905); *Watson v. Jones,* 41 Fla. 241, 25 So. 678 (1899); *Wheeler v. Baars,* 33 Fla. 696, 15 So. 584 (1894). If the trustee can prove that Chase offered the disengagement letter with reckless disregard to the truth of the representations therein, a reasonable jury could find liability.

Chase strongly argues that the trustee's allegation that it "should have known" of the fraud is both legally and factually insufficient. In part, the bank is correct. Chase had no duty to inquire into the underlying relationship between Government and its customers and creditors. A bank stands in a creditor-debtor relationship with its customer. *See eg. Vassar v. Smith,* 134 Fla. 346, 183 So. 705 (1938). The fact that Chase engaged in clearing securities for Government also does not create any legal duty. The clearing function requires that the bank process negotiable commercial paper without re-

gard to the underlying transaction between a customer-dealer and the equity owner of the security. In this case, Chase received Government's securities in fully negotiable form. The mere fact that the securities were registered in a person's name other than the bank's customer is insufficient to create any duty of inquiry in this case. *Cf. Irving Trust Co. v. Westchester County Sav. & Loan Ass'n (In Re Legel, Braswell Gov't Sec. Corp.)*, 648 F.2d 321, 327 (5th Cir. Unit B June 1981); *Cosmopolitan Credit & Inv. Corp v. Blyth Eastman Dillman & Co.*, 507 F.Supp. 954 (S.D.Fla. 1981) (Spellman, J.).

◼ The trustee also attempts to impose a duty of inquiry by claiming in count IV of the complaint that Chase owed a fiduciary duty to Government. In opposing the bank's motion for summary judgment on this issue, Tew argues that this is an issue of fact. This court disagrees and summary judgment in favor of the bank is warranted. There is no evidence in the record to indicate that Chase performed any role other than banking and clearing securities. Providing clearing services does not, without more, impart a fiduciary duty upon the bank. *See Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F.Supp. 1252, 1260 (S.D.N.Y.1988) (see authorities cited therein); *City of Harrisburg v. Bradford Trust Co.*, 621 F.Supp. 463, 474 (M.D.Pa.1985); *also see Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2nd Cir.1984) (citing New York law that banker-customer relationship is of a debtor-creditor, not fiduciary nature); *Teledyne Industries, Inc. v. Eon Corp.*, 373 F.Supp. 191, 201 (S.D.N.Y. 1974) (same).

There are also no issues of fact from which a reasonable jury could find the existence of a fiduciary duty. Contrary to Tew's assertions, Chase did not have broad discretion over the pledged securities. Aside from placing the securities in Government's account, the bank could only act upon express direction of the E.S.M. principals. *See* Clearing Agreement, Chase's Appendix, Volume II, exhibit 27; *also see In re Traurig*, 34 B.R. 637, 639 (Bankr.S.D.Fla.1983) (mere debtor-creditor or contractual relationship does not create fiduciary duty); *Beneficial Commercial Corp. v. Murray Glick Datson, Inc.*, 601 F.Supp. 770, 772 (S.D.Fla.1985) (same); *Matter of Bevill, Bresler & Schulman Asset*, 67 B.R. 557, 571 (Bankr.N.J.1986) (most clearing relationships only allow clearing firm to act solely on instructions from its customer, without knowledge of underlying relationship between dealer and consumer). There is also no evidence that Chase exercised domination or undue influence over Government. Indeed, the facts are contrary. Most importantly, there is no evidence that Government reposed trust in Chase or that Chase knew of such a relationship and accepted the obligation. *See Harris v. Zeuch*, 103 Fla. 183, 137 So. 135 (1931) (fiduciary relationship created when confidence reposed by one party and accepted by the other); *United States v. Reed*, 601 F.Supp. 685, 705, 713, 715 (S.D. N.Y.1985) (need mutuality to create fiduciary relationship), *reversed on other grounds*, 773 F.2d 477 (2nd Cir.1985). The record demonstrates that Government, acting through Alan Novick, only grudgingly surrendered any information as to the true nature of the E.S.M. corporations. The trustee does not dispute that Hanley continuously requested audited financial statements and a guaranty from Group. Even assuming that Chase knew that Government was insolvent and that it was engaged in the double hypothecation of customer securities, this does not persuasively support an inference that Novick ever confided in the Chase employees. While a contrary inference might be reasonable, this is the only evidence to support the existence of a fiduciary duty. Without more, reliance on this one inference without other facts is legally insufficient.

◼ However, even without a fiduciary duty, Tew has offered a prima facie case of fraudulent concealment and affirmative misrepresentation.

Where fraud is based on the nondisclosure of a material fact, the plaintiff must show that there was a duty of disclosure. A fiduciary duty can also furnish the neces-

sary duty to speak, but such is not the case here. Chase is quite correct in asserting that there was no duty to inquire as to the true nature of Government's business. However, this case presents a different issue; mainly, what is the duty of a clearing bank when it discovers a fraud committed by a securities dealer on its customers? Assuming Tew can prove that Chase knew of the fraud, is a clearing bank under a duty to speak to reveal the fraud? This court answers in the affirmative and finds that Chase owed a duty of disclosure to the creditors of the E.S.M. companies and to the appropriate governmental authorities.

The common law allows for the imposition of a new duty given the demands of our society. *See Kujek v. Goldman,* 150 N.Y. 176, 44 N.E. 773 (1896) (fraud claim). The notion of a duty is that the law attaches certain consequences to conduct regardless of the parties expectations. By living in our society and engaging in the conduct, the individual consents to complying with the law's dictates. In this case, if a reasonable jury finds that Chase knew of the fraud and failed to disclose it, this nondisclosure would constitute socially unreasonable conduct.

In imposing a new duty of disclosure, the court must weigh the interests and policies at stake. First, the parties' expectations should be considered. If the jury believes Tew's version of the facts, Chase should have known that its failure to speak would perpetuate the E.S.M. fraud. Further, assuming the bank knew of the fraud and acted to conceal its knowledge, failure to impose a duty would condone Chase's conduct. Under this set of facts, allowing nondisclosure would legalize sheer greed. The allegations of the complaint and the testimony of Hanley are that the bank did not want the fraud to be discovered when it had huge loans outstanding, collateralized by *double hypothecated securities.* Once again, assuming belief in the trustee's position, Chase made a conscious decision to sacrifice E.S.M.'s creditors by allowing the fraud to continue rather than risk financial loss from competing claims to the securities held in Government's account.

Chase relies upon the duty of confidentiality between a bank and its customer which would supposedly forbid any disclosure of account information. However, the cases cited by the bank allow for an exception in the case of a public duty of disclosure. *See Peterson v. Idaho First Nat'l Bank,* 83 Idaho 578, 367 P.2d 284 (1961) (exception if "circumstances give rise to a public duty of disclosure"); *Milohnich v. First Nat'l Bank,* 224 So.2d 759 (Fla. 3rd DCA 1969) (a "qualified duty of nondisclosure is evolving"). In the facts of this case, a bank has a duty of disclosure.

In the case of government securities, clearing banks play a powerful role. This type of security is relatively free from regulation by the comprehensive federal securities laws. *See Matter of Bevill, Bresler & Schulman Asset,* 67 B.R. 557, 569 (D.N. J.1986). Government securities dealers, especially those in a precarious capital position who are at the most risk to collapse, are dependent upon the credit of clearing banks. *See Id.* at 612. This control by the bank puts it in a unique position to prevent fraudulent activities by governmental securities dealers. As seen in this case, Chase was able to extract the unaudited financial statements from both Group and Government. According to the trustee, these documents showed that Government was insolvent and Chase was the first party to obtain access to the documents. Moreover, when dealing with little known dealers such as E.S.M., the bank should have been more diligent in its credit decisions. Alan Novick was extended a line of credit that eventually reached $50 million dollars. Rather than require audited financial statements prior to granting such credit, the bank acted first and investigated later. Chase also had an obligation as a national bank to be wary of government securities dealers without an established reputation. Given the lack of governmental regulation and the near limitless potential of reselling securities under repurchase agreements, Chase should have been more skeptical when approached. One of the reasons that the E.S.M. fraud went undiscovered for so many years was that its former officers and directors were able to capitalize on the

air of legitimacy inherent in having a clearing bank relationship with a national bank of Chase's reputation. As compared to the developing law of accountant liability, the public generally and the creditors of an affected company may justifiably rely on nondisclosure in the industry as evidence of the absence of fraud.

Finally, today's bankers, dealing in sophisticated commercial transactions, are professionals. The trend of the law appears to impose upon such individuals, when faced with particular information as to their client's wrongdoing, a duty to speak. *Cf. Tarasoff v. Regents of Univ. of Calif.*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) (pyschiatrists); *ITT, An Intern. Inv. Trust v. Cornfeld*, 619 F.2d 909, 927 (2nd Cir.1980) (accountant's duty to correct misstatements they have discovered in previously issued financial statements); *Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957, 960–61 (S.D.N.Y. 1981) (attorney's duty to speak regarding tax opinion letter), *aff'd*, 729 F.2d 1443 (2nd Cir.1983).

There is also a strong public interest in imposing a duty of disclosure in these circumstances. The state of Florida has a strong interest in deterring the fraudulent acts of its natural and corporate persons. Moreover, the institution of banking is a public enterprise. A complex regime of state and federal laws regulate many aspects of a bank's conduct. The law also protects banks by imposing criminal sanctions on those individuals who commit fraud against it. *See eg.* 18 U.S.C.A. § 1014 (West Supp.1989) (false statements on loan applications).

Finally, there is a strong public interest in protecting the integrity of the government securities market and the continued viability of repurchase agreements. The repo market in governmental securities performs several critical functions in our country's economy including serving as a tool for financing the national debt at the lowest possible cost, use as a form of monetary policy by the Federal Reserve, and in the case of GNMAs, aiding in the formation of a strong housing industry. *See Matter of Bevill*, 67 B.R. at 567–68.

Imposing liability upon clearing banks who discover a fraud and conceal their knowledge will also effectively serve the purposes of deterring future fraud and compensating victims. *Cf. First Nat. Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1415 (7th Cir.1988) (burdens of imposing duty on banking industry outweighed by threat of "flood of bogus securities"). Because clearing banks will need to be more diligent once a fraud is discovered and because securities dealers will be aware of the heightened scrutiny to which they will be subject, there will be less incentive to engage in fraudulent activity given the likelihood of discovery and disclosure. Moreover, with disclosure, creditors of a corporation, such as E.S.M., will be able to terminate their relationship much sooner, thereby minimizing their loss and robbing the fraudulent principals of investment funds to continue their scheme.

In sum, when a clearing bank actually discovers that a government securities dealer is defrauding its customers by double hypothecating their securities at a time when the company is insolvent, the bank is under a duty to the public's representative, the government, and to the creditors of the company to disclose the fraud.

However, the trustee does not rely merely upon nondisclosures. The factual allegations made by Tew, if believed, demonstrate that Chase took affirmative steps to conceal the E.S.M. fraud. A reasonable jury could find that the bank's action in allowing Government extra time to terminate their relationship and the alleged false disengagement letter were committed to continue E.S.M.'s existence, to buy time for the bank to regain its loans made to Government. *Cf. Hinson v. Drummond*, 98 Fla. 502, 123 So. 913 (1929) (misrepresentation by bank as to its solvency to induce customer to retain money on deposit is actionable).

■ Chase's final argument against the fraud claim is that there is no proximate cause between the alleged misconduct and the damages sought. The trustee seeks

approximately $70 million dollars in damages falling into the categories of operating losses, and personal loans and salaries/bonuses to the former E.S.M. management.

This argument fails. Contrary to Chase's argument, this is not a case of mere "but for" causation. True, had Chase disclosed the fraud in 1983 and refrained from affirmative actions to conceal the fraud, the damages would not have accrued. However, the intentional misconduct of the former E.S.M. management could have been reasonably foreseeable to Chase at the time of its disengagement. *See Nicholas v. Miami Burglar Alarm Co.*, 339 So.2d 175, 177 (Fla.1976) (negligence of alarm company actionable despite burglary by criminal); *Decker v. Gibson Products Co. of Albany, Inc.*, 679 F.2d 212, 215 (11th Cir.1982). If Tew's facts and inferences are accepted, the bank knew Government was insolvent in 1983 and that the officers were improperly pledging their customers' securities. On their face, the unaudited financial statements present the salaries of the company's officers and directors. Chase relied on an attempted analogy in oral argument of why proximate cause was lacking. According to counsel, if Tew's theory of liability is accepted, the bank would have been liable for a 1985 automobile accident involving a third party and an E.S.M. employee driving a company car on business. However, unlike the car accident, the bank knew that the E.S.M. principals were dishonest. Given the fact that the company was insolvent and the management was still paying itself significant salaries, the bank could have foreseen even the type of injuries actually incurred. Of course, in tort, if there is proximate cause, there is no requirement that the particular type of damages be foreseeable. The court finds that there is an issue of fact as to whether Chase artificially prolonged the life of the E.S.M. companies and thereby, caused Government's creditors to incur the damages asserted by the trustee.

 Next, Chase contends that Count II of the complaint sounding in civil conspiracy to defraud is insufficient. Under the law of the states of New York and Florida, there is no independent tort of conspiracy. *See Dozier & Gay Paint Co., Inc. v. Dilley*, 518 So.2d 946, 949 (Fla. 1st DCA 1988); *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So.2d 949, 950–51 (Fla. 3rd DCA 1984); *Lake Gateway Motor Inn v. Matt's Sunshine, Etc.*, 361 So.2d 769, 772 (Fla. 4th DCA 1978); *Valden Sportswear v. Montgomery Ward & Co., Inc.*, 591 F.Supp. 1188, 1191 (S.D.N.Y.1984) (applying New York law); *Raine v. Lorimar Productions, Inc.*, 71 B.R. 450, 454 (Bankr. S.D.N.Y.1987) (same). Rather, conspiracy in a civil action is an agency principal used to broaden the number of parties liable for the tortious conduct. *See Bridge C.A.T. Scan Assoc.s v. Ohio–Nuclear Inc.*, 608 F.Supp. 1187, 1193 (S.D.Fla.1985). The bank does not question Tew's proof of the elements of the conspiracy, but merely claims that Count II must be based upon an independent tort. The trustee alleges an actionable wrong in count I for fraud. Because this claim survived summary judgment, Count II is also sufficient.

 Count IV of the complaint alleges that Chase aided and abetted the E.S.M. fraud. In this case, the trustee must show the following elements to prevail: (1) a fraud committed by Government, (2) Chase's knowledge of the fraud, and (3) Chase's knowing rendition of substantial assistance.

The first element is not in dispute. As to Chase's knowledge, the trustee has alleged sufficient facts that a reasonable jury could find actual knowledge or recklessness. The bank contends that Tew must show actual knowledge; mere recklessness will not suffice citing the Florida authorities of *Cosmopolitan Credit & Inv. Corp. v. Blyth Eastman*, 507 F.Supp. 954 (S.D. Fla.1981) and *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir.1975). Both cases are distinguishable because they encompass facts within the scope of the federal securities laws, not Florida's cause of action for aiding and abetting a fraud. Based on the common law of fraud, Tew can prevail on the second element if Chase actually knew of the fraud or acted reck-

lessly. *See Dawkins v. Florida Industrial Comm.*, 155 So.2d 153 (Fla. 2nd DCA 1963); *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 162–63 (3rd Cir.1973) (relying upon Restatement of Torts, § 876(b)); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1360 (S.D.N.Y.1982) (see citations therein).

As to the third element, the trustee can only prevail if the jury finds that the bank acted knowingly or recklessly to render *substantial* assistance to conceal the fraud. There is a factual issue as to the bank's knowledge and whether it acted affirmatively or failed to disclose with the purpose of furthering the fraud. If Chase failed to disclose the fraud, gave Government extra time to terminate the clearing relationship, and forwarded the disengagement letter, all without intending to or recklessly acting to further concealment of the fraud, then there is no liability. The jury must also find that the failure to speak and the alleged affirmative misrepresentations represented "substantial assistance" to Government's officers and directors in concealing the fraud. Based on the above review of the facts, this is an issue to be submitted to the jury.

■ The last claim, count V, asserted by the trustee is for breach of the Special Agreement regarding the double hypothecation of customer securities. Basically, Tew contends that the testimony of Carolyn Denmark, a former Chase employee, demonstrates that Chase violated the Agreement by failing to segregate customer securities. However, there is no evidence that Chase was ever informed by a written confirmation ticket or otherwise that customer securities had been improperly pledged. On several occasions during a limited time period, Denmark was telephonically notified to "hold" certain securities for Government customers. While disputed by Chase, the evidence indicates that Chase did, in fact, hold these securities in Government's account.

Assuming a reasonable jury would find that Chase breached the Agreement, the trustee's damages do not flow from the breach and are unrecoverable. Tew contends that the damages at issue are E.S. M.'s operating losses after the disengagement with Chase and the loans and salaries/bonuses paid to the corrupt officers and directors.

It is well settled that the general measure of damages for breach of contract is the sum required to put the injured party in as good a position as if the contract had been performed. Government's protected expectation in this instance would be the lost profits and expenses incurred from the double hypothecation of the several securities that should have been segregated and not pledged as collateral. Such is not the case here. Incidental damages are also not applicable as they include only the costs incurred in the effort to avoid the loss from the breach. Here, any such measure would be speculative because there is no evidence that the several improperly pledged securities actually caused any harm to Government. Finally, the damages sustained by E.S.M. after 1983 were not foreseeable, consequential damages. To recover this type of indirect damage, the plaintiff must show that the type of harm was foreseeable to both parties at the time of the contract. Under this theory of law, E.S.M.'s operating losses and the excessive salaries and loans were remote and could not have been foreseen from the technical breach of the Special Agreement.

Having considered the above matters, the record in this cause and being otherwise duly advised, it is hereby

ORDERED AND ADJUDGED as follows:

(1) The motion by the trustee, Thomas Tew, for summary judgment on the two counterclaims and affirmative defenses three through eleven is GRANTED. As to these claims and defenses, the court finds that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.

(2) The motion by Chase Manhattan Bank, N.A. for summary judgment is hereby GRANTED IN PART AND DENIED IN PART. As to count V (breach of con-

**1570**

tract) and count IV (fiduciary duty), summary judgment is hereby ENTERED in favor of Chase Manhattan and against Thomas Tew. As to counts I, II, and III, the motion for summary judgment is DENIED. As noted above, the court finds that there are genuine issues of fact outstanding which require a trial to resolve the parties' dispute.

This court's order dated January 16, 1990 is hereby AMENDED and superceded by the present order dated January 22, 1990 pursuant to Federal Rule of Civil Procedure 60(a). This amended order is entered with the intention not to alter the court's previously announced substantive rulings, but to correct clerical errors and to add legal authority for certain propositions, inadvertently omitted in the first order.

DONE AND ORDERED.